IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Kenneth W. Adams,<br><br>           Plaintiff,<br><br>  vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>           Defendant. | Civil Action No. 6:08-3212-HMH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

On September 17, 2002, the plaintiff filed an application for DIB alleging disability beginning January 1, 2000. The application was denied initially and on reconsideration. On May 13, 2003, the plaintiff requested a hearing, which was held on November 12, 2003. Following the hearing, the administrative law judge considered the case *de novo*, and on March 2, 2004, determined that the plaintiff was not entitled to

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

benefits.  This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on September 27, 2004, and the plaintiff filed a civil action on November 4, 2004, for judicial review (C.A. 0:04-22869-PMD-BM).

On March 23, 2006, the Honorable Patrick M. Duffy, United States District Judge, remanded the claim to the Commissioner for further proceedings.  Judge Duffy instructed that upon remand the Commissioner was to, among other things, "make specific findings regarding Plaintiff's past relevant work (including a careful appraisal of Plaintiff's statements regarding his past relevant work and his inability to perform such work)" and to "perform a proper analysis of Plaintiff's residual functional capacity" (Tr. 327).  On August 9, 2006, the Appeals Council vacated the March 2004 decision and remanded the claim to an ALJ for further action(Tr. 331).  A supplemental hearing was held on December 5, 2006, at which the plaintiff and his attorney appeared (Tr. 297-315).  On December 29, 2006, the ALJ again found that the plaintiff was not entitled to benefits.  The Appeals Council denied the plaintiff's request for review on July 19, 2008, and the plaintiff filed the instant action on September 22, 2008.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

>(1)    The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.
>
>(2)    The claimant has not engaged in substantial gainful activity since his alleged onset date (20 CFR 404.1520(b)).
>
>(3)    Through the date last insured, the claimant had the following severe impairments: hypertension, coronary artery disease with status post myocardial infarction and angioplasty in 1989, non-insulin-dependent diabetes mellitus, and some clinical signs of mild osteoarthritis (20 CFR 04.1520(c)).
>
>(4)    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404,

2

Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to lift and carry up to 20 pounds occasionally and 10 pounds frequently with no limitations in fine manipulation but with walking or standing no longer than two hours in an eight-hour day.

(6)    Through the date last insured, the claimant's past relevant work as a bobbins and material inspector in the textile industry did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(7)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through December 31, 2005, the date last insured (20 CFR 404.1520(f)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which

3

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v.*

4

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The record reveals that the plaintiff was 60 years of age at the time of the ALJ's initial decision and 63 years of age at the time of the ALJ's supplemental decision.  He has a high school equivalent education (GED) and past relevant work as a textile doffer and inspector.

### *Medical Evidence*

The plaintiff has a remote history of myocardial infarction and angioplasty dating back to 1989.  Since July 2002, the plaintiff received medical treatment at the Augusta Veterans Administration Medical Center (VAMC) for a variety of ailments (Tr. 101-79, 208-54, 339-564).

In December 2000, the plaintiff reported that his right knee began to hurt.  Examination revealed his knee was within normal limits, except for some tenderness in the

5

right lateral aspect. Mild degenerative joint disease was diagnosed and the plaintiff was prescribed medication (Tr. 150).

During a February 2001 appointment, the plaintiff reported that he had not had any chest pains since his angioplasty in 1989 and that he had not used nitroglycerin since 1989. The plaintiff also reported that his knee was better with medication. The plaintiff's cardiac examination was unremarkable, his coronary artery disease was stable by history, and his hypertension was stable on medication. Chest x-rays demonstrated no acute cardiopulmonary abnormalities (Tr. 142-45, 166).

In May 2001, the plaintiff reported that he was "doing fine," had no complaints, and that he did not have any chest pain (Tr. 136, 139).

During June 2001, medical records from the VAMC reflect no cardiac symptoms were reported with studies, and the plaintiff's cardiac risks were well-controlled (Tr. 135).

An examination on July 31, 2001, revealed normal extremity strength and range of motion; intact sensations and reflexes; normal breath sounds; and a normal heart rate and rhythm. It was also noted that the plaintiff's coronary artery disease and hypertension were stable (Tr. 130).

At a follow-up appointment on January 29, 2002, the plaintiff reported he felt fine and denied any complaints of chest pain or shortness of breath (Tr. 111).

On July 30, 2002, the plaintiff presented to VAMC for an annual physical examination. He reported that he felt fine. Examination revealed a normal heart rate and rhythm, intact peripheral pulses, normal bilateral motor strength, normal reflexes, and no evidence of muscular atrophy (Tr. 105).

In a report of observations by SSA staff dated September 17, 2002, it was noted that the plaintiff had no difficulty sitting, standing, walking, or using his hands, but had decreased hearing in the left ear (Tr. 74).

6

On November 21, 2002, Dr. Edmund Gaines performed a consultative examination at the request of the state agency. The plaintiff reported that he had some shortness of breath with exertion but could walk three blocks without a problem, he was able to golf - riding, and his hypertension was under good control. He also reported the he drove and helped his wife with cooking and cleaning. Examination revealed the plaintiff's lungs were clear to auscultation and palpation; heart rhythm was regular; he had full range of motion of the upper extremities; good strength bilaterally in the upper extremities' normal bilateral strength of the hands; full range of motion of the ankles; good bilateral strength of the lower extremities; and normal reflexes. X-rays of his knees were unremarkable with no joint effusion, no joint space narrowing, and no evidence of arthritis. Dr. Gaines impression was as follows:

> The examinee does not seem to have any physical anomalies that he did not exhibit when he retired from Owens Corning. I think that the arthritis in his knees may be getting somewhat worse than it was at that time. He may be exhibiting a little more shortness of breath. Therefore, I think that a job that required prolonged standing, walking, moving, or lifting certainly would not be suitable for the examinee, but that any sedentary occupation which he wanted to pursue would seem to be reasonable.

(Tr. 180-86).

On December 9, 2002, Dr. Seham El-Ibiary, a state agency medical consultant, reviewed the plaintiff's records at the request of the Commissioner and completed a Physical Residual Functional Capacity Assessment form. Dr. El-Ibiary determined that the plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. He also determined that the plaintiff had unlimited ability to push and/or pull and that he did not have any postural limitations (Tr. 191-98). On February 28, 2003, Dr. Frank Ferrell, a state agency medical consultant, reviewed the records on file and affirmed the assessment of Dr. El-Ibiary (Tr. 198).

7

A March 3, 2003, treatment note indicated that the plaintiff complained of shortness of breath and chest pains while walking. The office not shows the plaintiff reported that he had retired four years earlier because he was unable to perform the work any longer. Chest x-rays revealed the plaintiff had severe chronic interstitial lung disease. During the office visit, the plaintiff reported no pain, and that he had intact sensations in his feet. Laboratory testing showed that his blood glucose was 311 (Tr. 228-34).

The plaintiff underwent an endoscopy on March 14, 2003 due to complaints of dysphasia. The report showed that plaintiff had mild esophagitis with Schatzki ring, as well as multiple small ulcers on the antrum of his stomach. The office notes revealed that the Schatzki ring was dilated. The plaintiff was diagnosed with erosive esophagitis and instructed to discontinue the use of all NSAIDS, unless mandatory (Tr. 224).

On April 29, 2003, and again on May 1, 2003, the plaintiff complained of numbness of the left hand. Examination revealed good circulation, good strength, normal pulse, and full range of motion of the left arm, shoulder, and wrist (Tr. 208, 212). A follow-up examination on May 22, 2003, revealed good strength and a good pulse in the left hand, but the strength in the left hand was slightly less than in the right hand (Tr. 209, 242). A nerve conduction study revealed median and ulnar nerve lesions. Naprosen was prescribed and reportedly helped (Tr. 243). EMG studies were performed on May 27, 2003. The EMG report showed that the plaintiff had carpal tunnel syndrome and ulnar mononeuropathy (Tr. 245-46). The plaintiff underwent a second EMG on August 27, 2003. The diagnosis was again carpal tunnel syndrome and ulnar mononeuropathy (Tr. 243-44).

On August 29, 2003, the plaintiff denied chest pain or dyspnea on exertion and reported that he walked a mile every two to three days (Tr. 235).

An examination on September 9, 2003, revealed normal bilateral upper extremity strength and normal reflexes (Tr. 243).

On April 14, 2004, the plaintiff was seen by Dr. Joseph Jura in the Pulmonary Clinic at the VA Hospital for complaints of dyspnea. The office notes for this visit showed that the chest x-rays revealed increased interstitial markings at bases and a mild increase in cardiac size. Dr. Jura also noted that the spirometry showed a restrictive pattern. The plan indicated that they would obtain a HRCT and full PFTs, including lung volumes, and DLCO to evaluate for interstitial disease. An echocardiogram would also be ordered to evaluate for CHF (Tr. 556-557). The pulmonary CT scan taken on April 21, 2004, indicated that the plaintiff had pulmonary fibrosis with basilar bronchiectasis, aberrant right sub-clavian artery and possible cholelithiasis (Tr. 353).

During June 2004, the plaintiff complained of numbness and tingling in the left hand and was provided with an elbow splint to be worn at night (Tr. 551). At a follow-up appointment during September 2004, the plaintiff reported that he continued to have pain in his left hand, which he described as being a 4 on a scale of 1 to 10 (Tr. 545).

The plaintiff was seen in the Internal Medicine Clinic on October 6, 2004, in preparation for the planned ulnar nerve transposition surgery. The physician's office notes showed that due to the plaintiff's uncontrolled diabetes, no elective surgeries should be performed at that time (Tr. 538-39).

The plaintiff was seen in the Nutrition Clinic on October 25, 2004, for education on a low simple sugar diet. He was instructed on the importance of compliance with diet and diabetes (Tr. 537).

In a June 23, 2005, pain assessment, it appears the plaintiff reported he had no pain (Tr. 520).

On December 5, 2005, the plaintiff was seen in the emergency room with complaints of left chest wall pain with radiation to the left arm. He stated the pain was constant and denied any nausea or increased shortness of breath. The plaintiff told the ER personnel that he had taken a Nitroglycerin tablet, but had not received any relief from the

symptoms. After a battery of tests, he was admitted to the hospital for treatment (Tr. 440-505). The plaintiff underwent a left heart catheterization and angioplasty on December 6, 2005. The report showed that the plaintiff had two-vessel artery disease. Aggressive medical treatment was recommended (Tr. 451-52). The plaintiff was discharged from the hospital on December 7, 2005 (Tr. 505). The discharge summary noted that the plaintiff's chest x-ray showed increased pulmonary vascular markings. The electrocardiogram showed normal sinus rhythm with possible T wave inversions in lead III. It was also noted that the plaintiff's symptoms may have been either a plaque rupture or vasospasm. The catheterization showed two-vessel CAD, involving the distal circumflex and mid LAD. The mid LAD stenosis was not believed to be hemodynamically significant, given the lack of a perfusion abnormality in the LAD distribution on the thallium study (Tr. 376-79). The thallium study report showed borderline left ventricular ejection fraction at approximately 52%, with no significant focal wall motion abnormality. Depending on clinical status, left ventricular ejection fraction could be further evaluated with multigated cardiac blood pool study or echocardiography (Tr. 346-50).

### *Hearing Testimony*

At the November 12, 2003 hearing, the plaintiff testified that he had a driver's license and was able to drive (Tr. 30). He testified that medication helped relieve his pain and that he had no side effects from his medication (Tr. 39-40). He testified that he performed his inspector job while sitting on a stool for eight hours a day and used a strobe light to check bobbins (Tr. 34-35). He further testified that he did not have to do any lifting with that job (Tr. 36). He testified that he could not return to his inspector job because he would have to move a strobe light up and down and that his arm "Ain't no good no more and [he] can't grip anything." (Tr. 37). He further testified that he had cramps in his fingers

10

on both hands (Tr. 38). The plaintiff also testified that medication helped relieve the pain in his hand (Tr. 40).

At the December 5, 2006 hearing, the plaintiff testified that he had numbness in his hands and that he could not grip things (Tr. 304-05). He also testified that his job had changed after he had left (Tr. 306). He testified that while he was working he had a hard time using his arms (Tr. 308). The plaintiff testified that he could not go back to his job because he could not walk as much and that his hands were worse (Tr. 309). He further testified that he had not had surgery on his wrist because his blood sugar was not under control (Tr. 310).

## **ANALYSIS**

The plaintiff alleges disability since January 1, 2000, due to a heart attack, high blood pressure, diabetes, hearing problems, and knee pain. He was 60 years old at the time of the ALJ's initial decision and 63 years old at the time of the ALJ's supplemental decision. He has a high school equivalent education (GED) and past relevant work as a bobbins and material inspector. The plaintiff worked at Owens Corning for approximately 30 years prior to having to stop work. The ALJ found that the plaintiff had the residual functional capacity ("RFC") to lift and carry up to 20 pounds occasionally and 10 pounds frequently with no limitations in fine manipulation but with walking or standing no longer than two hours in an eight-hour day. The ALJ further found that the plaintiff's RFC did not prevent him from performing his past relevant work as he performed it (Tr. 285-86). The plaintiff argues that the ALJ erred by (1) failing to perform a proper analysis of his ability to perform his past relevant work; (2) failing to perform a proper analysis of his RFC; and (3) failing to incorporate all of the restrictions indicated by Dr. Gaines into the RFC findings.

The ALJ found that the plaintiff could perform his past relevant work as a bobbins and material inspector and was therefore not disabled (Tr. 285). This finding, as

pointed out by the plaintiff, was critical to the denial decision as the plaintiff would have otherwise been found disabled under the medical-vocational guidelines ("the Grids"), as the ALJ found the plaintiff was more than 55 years old, was limited to a restricted range of sedentary to light work, and gave no indication of transferability in any skills to other sedentary jobs (Tr. 278-86). *See* 20 C.F.R. Pt. 4, Subpt. P, App. 2, § 201.02. Previously, Judge Duffy had remanded the plaintiff's case in part for the ALJ to provide a "careful appraisal of Plaintiff's statements regarding his past relevant work and his inability to perform such work" (Tr. 327). The plaintiff argues that the ALJ has again failed to adequately address this issue.

> Social Security Rule 82-62 provides in pertinent part:
>
> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.
>
> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

SSR 82-62, 1982 WL 31386, *3 (1982).

In the remand hearing in 2006, the plaintiff essentially reiterated the same reasons he initially provided for being unable to perform his past work - namely that it

became more difficult to be constantly pushing his stool around and constantly holding the strobe light (Tr. 308-309). At the plaintiff's first hearing in 2003, the plaintiff was asked why he could not return to his textile inspector job, where he was allowed to use a stool the majority of the time while doing his job (Tr. 37). The plaintiff testified that he could no longer perform the lighter job "[b]ecause you'd have to push that stool with your legs, and you'd have to go up and down the strobe light. And you'd have to change hands, and my left arm ain't no good anymore" (Tr. 37).

The ALJ noted that the plaintiff alleged difficulty constantly moving around on the stool and pushing the stool, as well as problems continuously holding the strobe light due to the problems with his hands (Tr. 285-86). The ALJ rejected these assertions finding that "the evidence does not show he was on an uneven or especially rough surface or that he needed to exert significant force with his lower extremities in rolling the stool. Further, I find no limitations that persisted for any consecutive 12-month period in the use of the claimant's upper extremities, other than the limitations to lifting and carrying no greater than 20 pounds occasionally and 10 pounds frequently, based on the combined effect of all of his impairments" (Tr. 285-86).

The ALJ specifically accepted consultative examiner Dr. Gaines' opinion that the plaintiff would not be suitable for any job that "required prolonged standing, walking, moving, or lifting … but any sedentary occupation which he wanted to pursue may be reasonable" (Tr. 183, *see* Tr. 284). Further, the ALJ appeared to accept the plaintiff's testimony regarding the past work that it involved constantly moving on the stool and constantly holding (lifting) the strobe light to do the job. As argued by the plaintiff, given the ALJ's acceptance of the opinion that the plaintiff would not be suitable for a job that involved a lot of moving or lifting, it is difficult to understand how the ALJ could reject as not supported by evidence the plaintiff's allegations that these very activities made this job impossible for him to perform now. The ALJ did not explain why he found the plaintiff able

13

to return to a job that required him to be constantly moving, when Dr. Gaines indicated a job that required prolong moving was not suitable for him.

Further, regarding the ALJ's statement that there is no evidence of upper extremity limitations beyond the lifting restrictions indicated, the plaintiff contends that objective test results did support his assertions that he would have problems using his hands. The plaintiff testified that this job required him to switch hands with a strobe light as he ran the light over bobbins to check for defects. The plaintiff testified that the job involved constant reaching and handling with this light (Tr. 35). The plaintiff further testified that he was no longer able to do the job in part due to his problems holding things with his left hand (Tr. 37). In the original hearing decision, the ALJ noted that the plaintiff had been treated for problems with numbness and weakness in his hands, with abnormal EMG testing (Tr. 18). In the subsequent hearing decision, as set forth above, the ALJ considered the hand impairment issue again, but asserted the evidence did not show an ongoing significant impairment in regards to the use of the plaintiff's hands for a consecutive 12-month period (Tr. 282).

As argued by the plaintiff, the evidence shows that he had an ongoing significant impairment to the use of his hands for a consecutive 12-month period. The record reflects that the plaintiff was seen for complaints of numbness and lack of ability to lift on May 27, 2003 (Tr. 246). A few days earlier he had been treated for complaints of his arm hurting more and hand numbness (Tr. 241-42). The plaintiff was noted to have a clinical diagnoses of carpal tunnel syndrome and ulnar mononeuropathy (Tr. 246). EMG testing on June 26, 2003, documented abnormal results, supporting the clinical diagnoses (Tr. 247-48). On September 9, 2003, the plaintiff was treated for complaints of numbness and inability to grip with his hands (Tr. 243). He was noted to have decreased sensation. He returned a few months later, on January 5, 2004, still complaining of "continue with numbness in [left] hand (Tr. 564). On January 24, 2004, the plaintiff was issued a left wrist

14

cock-up splint, on continued complaints of significant pain and numbness in his left hand (Tr. 560-61). Testing showed decreased grip strength, and the plaintiff's stated goal was to be able to continue to play golf. The plaintiff was referred for physical therapy for his hand problems, but this treatment was not successful in relieving his symptoms (Tr. 559). On May 6, 2004, the plaintiff presented to the VA with a primary complaint of "My hand still hurts" (Tr. 553). On June 9, 2004, the plaintiff was treated at the orthopedic surgery clinic of the VA for consultation on surgery for his upper extremity problems (Tr. 551-52). He noted that he had difficulty lifting things and was unable to grip things like his golf club (Tr. 551). He was diagnosed with left ulnar neuropathy and sent to pre-op for clearance for an ulnar nerve transposition (Tr. 552). On June 17, 2004, he was seen for the purposes of needing a custom molded elbow splint (Tr. 551). On September 3, 2004, the plaintiff was again seen for "pain and numbness in [left] hand" (Tr. 545-47). His primary complaint was "I still hurt in my left hand" (Tr. 543). On December 21, 2004, the plaintiff was noted to have joint stiffness in his hands (Tr. 527).

The plaintiff also notes that the ALJ refers a number of times in the hearing decision to the plaintiff playing golf as evidence against him. The plaintiff indicated at the supplemental hearing in 2006 that he had not played golf in "probably" about 3 years (Tr. 305). The record from January 24, 2004, indicated the plaintiff had a goal of being able to continue playing golf. Later, in early summer 2004, the plaintiff indicated that he was unable to do things like holding a golf club. This evidence corroborates the plaintiff's statements that he became largely unable to play golf sometime in the vicinity of three years prior to the supplemental hearing. As noted by the plaintiff, there are references to the plaintiff playing golf subsequent to this time; however, references such as "occasionally plays golf" makes it unclear whether the provider was relying on the plaintiff's earlier history or referring to something more specific.

15

Also critical to the ALJ's finding that the plaintiff could return to his past work was the ALJ's finding with regard to the plaintiff's use of a rolling stool in performing his job as an inspector (Tr. 286). Specifically, the ALJ determined that the use of the rolling stool was not a special accommodation allowed by the employer because "the plant allowed all employees in that job to perform the job in the same manner, with use of the stool throughout the work shift" (Tr. 286). As pointed out by the plaintiff, the ALJ incorrectly asserted that the plaintiff testified that all employees that performed his job used the stool (Tr. 285). The plaintiff actually testified that of the three persons doing that particular job "some" used the stool and some did not, depending on whether the person was having problems with standing or a "bad back" (Tr. 306-307). The plaintiff argues that his testimony shows that the job was normally performed standing and walking up and down the area where the inspection was taking place, and the stool was provided as an accommodation for his physical limitations (Tr. 307). The plaintiff further argues that by providing stools to the plaintiff and other employees who needed them his employer was simply doing what it was legally required to do under the Americans with Disabilities Act (pl. brief 20-21).

This court finds that, given the plaintiff's testimony in this case, the ALJ's finding that the rolling stool was not an accommodation was in error. The ALJ cited no evidence that the job was actually performed differently than indicated by the plaintiff. As the ALJ found the plaintiff was limited to standing and walking only two hours per day (Tr. 278-79), the plaintiff could not perform the job as it was typically performed *without accommodation*. Furthermore, it appears to this court that, given the plaintiff's upper extremity limitations, the plaintiff would be unable to perform his past relevant work even as he performed it *with accommodation.* This court agrees with the plaintiff that the medical evidence as a whole corroborates his testimony, and substantial evidence does not support the ALJ's finding that the plaintiff's past relevant work did not require the performance of

16

work-related activities precluded by his residual functional capacity. Accordingly, given the ALJ's other findings, the plaintiff should have been found disabled under the Grids.

## **CONCLUSION AND RECOMMENDATION**

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits. The plaintiff has had two disability hearings over the seven years since he filed for disability, and this case has already been remanded once. Reopening the record for more evidence would serve no purpose. *See Breeden v. Weinberger*, 493 F.2d 1002, 1011-12 (4th Cir. 1974) (finding that where case had been pending in the agency and courts for five years and had been remanded once before for additional evidence, reversal without remand was warranted). Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the plaintiff be awarded benefits.

s/William M. Catoe
United States Magistrate Judge

October 27, 2009

Greenville, South Carolina